## WILLIAM K. REED *et al.*

*v.*

## GEORGIE H. PETERSON.

1. ESTOPPEL—*by party's acts.* Where certain moneys of a testator in his guardian's hands at the time of his death was inventoried as personalty, and as such received from the executor by a purchaser from the sole legatee of the personal property, on a purchase consummated by fraud and deception practiced upon the legatee, and for a grossly inadequate price, it was *held,* that the purchaser from the legatee, on bill filed by the latter to set aside the sale for the fraud, was estopped from averring that the money was not personalty, but real estate, and thus defeat the relief sought, especially when the heirs of the testator made no claim for the same as realty.

2. FRAUD—*inadequacy of price paid as evidence of fraud.* Although mere inadequacy of price is not, *per se,* ground for setting aside a transfer of property, yet it may be so gross and palpable as to amount, in itself, to proof of fraud, and this, in connection with proof of imposition and misrepresentation on the part of the purchaser and his agents, will be sufficient to characterize the transaction as fraudulent in a court of equity.

3. SAME—*dealings by one in fiduciary relation.* The principles which govern the dealings of one standing in a fiduciary relation, apply to the case of persons who clothe themselves with a character which brings them within the range of the principle.

4. SALE—*when set aside for fraud.* A sale of a sole legatee's entire interest under a will, worth $4300 in cash, after the payment of all costs, charges and expenses, for the sum of $250 and some few articles of property, made upon representations of the attorney of the executor (while acting, also, as the attorney of the purchaser,) that extensive litigation was likely to follow in respect to the validity of the will and the property devised to her, and who suppressed and concealed material information as to the extent of the property devised and the certainty of its recovery, and threw out innuendoes calculated to influence the legatee, who resided many hundred miles from the place of the testator's death, and had no means of information except what the attorney gave her, and who relied upon what he said, when it also appeared that the attorney pressed her to a speedy decision by working upon her fears of losing all, it was *held,* that, owing to the fraud practiced and the means employed by one apparently in a fiduciary character, and in whom trust and confidence were reposed, the sale was properly set aside, and the purchaser and his agent required to account to the legatee for the value of the property obtained under such sale.

5. FRAUD BY AN AGENT—*of his liability personally.* On bill filed to set aside a sale and transfer of a legatee's interest under a will, against a company

which became the purchaser, and its cashier and principal manager, for fraud practiced upon the legatee, where it appears that such principal manager actively participated in consummating the purchase, all the transfers being made directly to him, and that he had, at the time, a large amount of stock in the company, and received pecuniary profits by the purchase, there is no error in rendering a decree against the company and the cashier, personally, for the sum required to be paid to the complainant. A court of equity will not attempt to make a contribution between the perpetrators of a tort, in decreeing relief against them.

6. In an action at law for damages, the fact that a defendant acted throughout in the capacity of agent, in a fraud perpetrated by him, will afford him no excuse.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

Mr. GEORGE SCOVILLE, for the appellants.

Messrs. PAGE & PLUM, for the appellee.

Mr. JUSTICE BAKER delivered the opinion of the Court:

This suit in chancery grows out of one of a series of transactions extending over a period of some twenty-five years, all having some reference to the same subject matter. Various of these have, from time to time, been before this court for investigation, and several of their developments are still pending for solution. We will seek to avoid all reference to these former controversies, and to all matters not involved in the present proceeding, and even to those matters involved therein which did not form the basis of any of the relief granted by the circuit court in the decree herein appealed from. This will free the case from complications not now necessary to discuss, and eliminate from the record questions passed upon by the court below, that may now be regarded as *res judicata*.

The present bill was filed by Georgie H. Peterson, the appellee, against appellants, the Illinois Land and Loan Company and William K. Reed, to set aside a sale and recover the value of certain personal property, bequeathed to her by her stepson, Percy W. Bonner, deceased, on account of the alleged

19—91 ILL.

fraud of appellants, and for gross inadequacy of consideration.

In the fall of 1869, the testator, a mulatto boy nineteen years of age, was the owner of an undivided half of a valuable property, situate on the corner of La Salle and Monroe streets, in the city of Chicago. He was consumptive, and had started to go south for his health, and stopped, temporarily, at Kankakee. The appellant corporation, which held certain tax claims against the property, thereupon dispatched Mr. Scoville, its solicitor, the appellant Reed, who was its cashier and general manager, and a third person, to Kankakee, and they induced the boy to return to Chicago. Shortly thereafter, through the endeavors of these same persons, the old guardian of the boy was removed from his office, and one P. W. Gates was appointed in his place. Gates had been the client of Mr. Scoville for some twenty years, and he states, in his testimony, he consented to take the guardianship, but that Mr. Scoville agreed to do the work. Mr. Scoville states, on cross-examination, it was understood between Mr. Gates and himself that he should act as Gates' attorney, and render all the assistance he could, if Gates was appointed guardian. And it impresses us, from an examination of the evidence in the record, that in all the subsequent transactions the attorney and not the client was, for all practical purposes, though not nominally, the guardian of the boy.

Soon after the appointment of the new guardian, he borrowed $8000 for his ward, and executed a mortgage upon the real estate to secure the same. The loan was effected through the appellant Reed. The petition to the court, the order of court, and the mortgage, were all drawn up by Mr. Scoville.

On the 20th day of January, following, 1870, Percy W. Bonner made a conveyance of his interest in said land to said Land and Loan Company, but this conveyance was not placed upon record until the day of his death. There was also a contract executed by the boy and the company, on the day of the date of the deed, in which the real consideration of the deed

was stated. It is only necessary, here, to refer to these two instruments for the purpose of showing the *status* of affairs at the time of Percy's decease. The question of the validity of the deed was passed upon by this court in *Illinois Land and Loan Co.* v. *Bonner*, 75 Ill. 315; and the claim of appellee, based upon the concurrent contract, was not allowed by the court below, and a discussion of its provisions is now unnecessary.

Percy W. Bonner died on the 26th day of July, 1870. Prior to his death he made a will, in which he gave and bequeathed to appellee all his personal property and estate, of every kind, whether in possession, suit or expectancy, consisting, in part, of a gold watch and chain and of a claim for money pending against Daniels and others, and in part of certain city bonds of Chicago, in the hands of C. A. Gregory, and to recover which legal proceedings had been had and were to be prosecuted,—and in which will he constituted said P. W. Gates his executor.

The amount of cash that came to the hands of Gates, as executor, after the payment by the guardian of all funeral expenses, costs of court, guardian's commissions and attorney's fees, was $3702.29. This money was the remainder of the $8000 raised, by mortgage, for the support of the minor and for the payment of taxes and costs of litigation. There is no merit in the claim, now made by appellants, that it was a part of the realty, and went to the heirs, and not to the legatee under the will. The heirs have never claimed it as such. It was paid to the executor as a part of the personal estate, and was inventoried by him as such, and appellants received it from him as such, on the written order of appellee, and under a sale from her, and they are now, in equity and good conscience, estopped from averring that it was not personalty.

There was, also, in the hands of one Gregory a city bond of Chicago, of the value, with accumulated interest, of about $1600, that he, Gregory, had received and held as the attorney of young Bonner. It is true, the delivery of this bond

292          REED *et al.* v. PETERSON.          [Sept. T.

Opinion of the Court.

to the guardian had been, for years, enjoined; but it clearly appears that this injunction had been dissolved, and the suit in which it issued dismissed, months before the decease of Bonner, through the endeavors of Mr. Scoville. There is no claim Gregory was not perfectly responsible, pecuniarily. The demand was inventoried by the executor as a good and valid claim, and we are wholly unable to appreciate the position assumed, that this bond and accrued interest was not a part of the personal estate of the deceased.

Disregarding various other claims of property from which appellants seem to have derived benefit, but for which no relief was granted appellee, we have here a personal estate of the cash value of over $5300, and it appears the total indebtedness of the estate, including executor's commissions, costs of county court, and attorney's fees paid, amounted to only $1039.72, leaving a net value to said estate of over $4300.

The condition and value of the property bequeathed to appellee were fully known to Mr. Scoville. He had managed the affairs of the estate, and attended to all its litigation, for nearly a year past, and had received from the guardian therefor fees, for himself and firm, amounting to over $1500. And appellants were equally well advised. Mr. Scoville had been the attorney for each of them for many years, and only became connected with the matter of this Bonner estate in furtherance of their interests, and it is evident, from the circumstances and details in proof, that whatever knowledge the attorney had material to the interests of the clients, was also known to them, and that Scoville and appellants were acting in concert in the whole transaction we are now considering.

At the time of her step-son's death, appellee, who is a mulatto woman, was head chambermaid on a steamer running on Long Island Sound. On hearing of his death, she wrote to Mr. Gates, his guardian, requesting that one or two articles belonging to her, that had been in the possession of the stepson, should be forwarded to her. She states, in her testimony, this letter was responded to by Mr. Scoville in person, repre-

senting Mr. Gates, a few weeks after Percy's death. . She testifies, in substance, that he informed her that the will, a copy of which was shown her, was not a legal document, on account of Percy being under age, but that his guardian was anxious his wishes should be carried out; that the estate was very much involved; that Gregory had obtained possession of the ·bonds mentioned in the will years ago, and refused to give them up, and it would be impossible to obtain them, by suit or otherwise; that it was utterly impossible she could ever get any benefit from the suit against Seth Daniels; that Percy had left a trunk, and very nice clothing and jewelry, and watch and chain, and guitar and case; that he said nothing about the money borrowed, or any other assets of Percy's estate, but said the repudiation of the agreement and deed by the heirs would have the effect of throwing her out altogether. She further testifies, he offered her, on behalf of the appellant company, $250, and the trunk, clothes, watch, chain and guitar, and warned her of threatened chancery litigation, and of possible loss of all benefit under the will, and urged that Percy's guardian was anxious .to have the matter settled forthwith, and pressed her for an immediate decision. And further, that by transferring the suits and claims under the will, it would strengthen the company in its controversies with the heirs and Gregory, who were claiming interests in the real estate.

Some of these statements are denied in the deposition of Mr. Scoville, and others are sought to be explained away; but we regard the testimony of appellee as corroborated, in most of its substantial points, by the letters written by Mr. Scoville, and dated August 15, August 16, and August 23, 1870, and by the surrounding circumstances of the case. And then, we do not understand, from his own showing, that he gave her correctly to understand the real condition of affairs, that he informed her the injunction had been dissolved, and there was nothing to prevent the devisee under the will from recovering the city bond and interest, and that there was

294      REED *et al. v.* PETERSON.      [Sept. T.

Opinion of the Court.

a large residue of cash in the hands of the guardian, but a small part of which would probably be required to pay debts and expenses. By his own showing, he prominently held before her the suggestions that there was a doubt as to whether the balance in the hands of the guardian would be considered personal property which he could bequeath by will, that the heirs would probably claim it, and try to set aside the will, and that the debts would have to be paid first, and, if necessary, all the personal property would have to be sold for such purpose. He closes one of his letters by saying: "You will see the necessity of doing at once whatever is done, before the personal property is disposed of by the executor."

In this case there was such a gross disproportion between the insignificant sum of $250 paid appellee and the real value of the property transferred by her, over $4300, as is of itself enough to raise a strong presumption of fraud. While mere inadequacy of price is not, *per se,* ground to set aside a transfer of property, yet it may be so gross and palpable as to amount in itself to proof of fraud. "And," as is said by Mr. Justice STORY in his Equity Jurisprudence, "where there are other ingredients in the case of a suspicious nature, or peculiar relation existing between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud."

Here, we have numerous other ingredients that tend to show fraud and imposition. This uninformed woman, hundreds of miles away from where she could inform herself by personal investigation, even if she were capable of making such, as to condition of the affairs of her deceased step-son, who had recently died leaving no brothers or sisters, writes, as she most naturally and properly would, to the guardian and executor of the deceased. Her communication is answered by the speedy personal appearance of the attorney of such guardian and executor, who comes representing that guardian and executor as anxious that the wishes of the boy should be carried out, and who is working ostensibly in furtherance of

the objects of the will. This attorney had for many months been managing the dead boy's business and was thoroughly advised as to the state of his affairs. He had personally superintended the burial of the boy and was sent by the guardian and executor to the step-mother, for the express purpose of giving her information and advice. Nothing is more natural than that the step-mother should place implicit confidence and faith in the representations thus made her. And she had a right to rely on statements made to her under such circumstances. As executor under the will, Gates stood in a fiduciary character to appellee, the beneficiary and sole legatee under the will. And Scoville came to her as the attorney and representative of this trustee. The principles which govern the case of dealings of persons standing in a fiduciary relation apply to the case of persons who clothe themselves with a character which brings them within the range of the principle. Kerr on Fraud and Mistake, 104, and cases there cited.

The parties here did not stand upon an equal footing, and at arm's length, and the confidence reposed and undue influence exerted are affirmatively shown by the facts and circumstances in proof, even were we to assume that no fiduciary relation existed as between the beneficiary under the will and the attorney and confidential representative of the executor.

The parties came together at a great disadvantage to appellee; and the false suggestions made, the misleading innuendoes thrown out, the suppression of material information, the haste urged when there was no necessity for speedy action, and the threats of a speedy sale of property specifically bequeathed, when there was abundant cash on hand to more than pay all probable or possible demands against the estate, are all badges of fraud. We think the other circumstances in evidence, when added to the fact of gross inadequacy of price, afford ample and sufficient proof of the fraud charged in the bill.

It is urged, that, although appellants held an order on Gregory for the city bond, and an assignment of the claim from appellee, yet as they never collected the bond or any part

thereof, they should not be held for its value. It is true Gregory testifies he never paid to Reed or to the Illinois Land and Loan Company the bond or any part of it. But it appears that on the 19th of October, 1870, there was a compromise and full settlement between Gregory and the company of all disputes between them growing out of the Bonner property; that Gregory had or claimed certain rights and interests of some of the heirs of the original Bonner estate, and of one of the heirs of the estate of Percy W. Bonner, then lately deceased, and tax and other claims, and that the company held conflicting titles and claims, and the interest in the litigation pending against Gregory and others, and that these conflicting interests were compromised in that agreement. As we understand the evidence, the company got the benefit of the demand for the bonds in that settlement.

Reed testifies, speaking of the order on Gregory for the bond: "I gave it to our attorneys, to be used to enable us to recover bonds said to be in his (Gregory's) possession," "held by him belonging to the Bonner heirs, issued by the city." "If there were such it was intended to begin proceedings, or prosecute proceedings already begun for their recovery." He further says: "I understood in that settlement the various interests, including titles procured by Gregory from various heirs, the dower interest, adverse possession by him, and all other antagonistic interests and claims, were fully settled."

Mr. Gregory states that he thinks a suit was brought by Mr. Gates against him to recover the bonds. In this he is corroborated by appellee, who swears that Scoville represented to her, at their interview in New York, that Percy left a suit pending for a certain set of bonds held by Gregory. Gregory also swears, with reference to this suit: "It was dismissed, and I presume was a part of the general settlement," and he also makes other statements to the same effect. It is true, as is urged, he testifies, "the bonds received by me are all properly accounted for," but he nowhere tells or is called upon to tell to whom or when they were accounted for.

But the most satisfactory evidence on this point is found in the agreement itself. The bonds were issued by the city of Chicago in payment for a part of the Bonner lots taken for the extension of La Salle street; and the ground on which the injunction heretofore referred to was predicated, was that the bonds stood as the representative of the land taken, and were, in equity, the property of the owners of the several estates and interests therein. In the agreement this provision occurs: " It is further understood and agreed, that each party hereto releases and discharges the other from all claims and demands arising from or growing out of transactions connected with said property heretofore; the compromise hereby effected being based upon such release and discharge." This stipulation of the parties includes the matter of the demand for the bonds.

It is also urged, the decree is erroneous in that it is not only against the company, but personally against the appellant Reed for the payment of $5578.18 and costs; that as Reed was cashier of the company and acting in all these transactions for the company, and as the moneys realized went to the company, and none of it personally to him, he should not be held liable personally therefor. We do not care to quote from the testimony to show that Reed was the controlling spirit in all these various transactions. And then all the several transfers of property were made directly to him, and he had, at the time, a large amount of stock in the company. He was interested in the profits derived therefrom, and received pecuniary benefits thereby.

In an action at law for damages, the fact that a defendant acted throughout in the capacity of agent, in a fraud perpetrated by him, will afford him no excuse. *Allen* v. *Hartfield*, 76 Ill. 358; *Campbell* v. *Hillman*, 15 B. Monroe, 508; Story on Agency, sec. 311. The same doctrine seems to have been applied by the court of chancery in cases of bills filed for purposes somewhat similar to the scope and objects of this bill. In *Arnot* v. *Biscoe*, 1 Vesey, Sr. 95, Lord HARDWICKE held there was a good equity for the plaintiff against Biscoe, and

said: "If the attorney or vendor of an estate, knowing of incumbrances thereon, treats for his client in the sale thereof without disclosing them to the purchaser or contractor, knowing him a stranger thereto, but represents it so as to induce the buyer to trust his money upon it, a remedy lies against him in a court of equity, to which principle it is necessary for the court to adhere, to preserve integrity and fair dealing between man and man." In *Seddon* v. *Connell*, 10 Simons, 86, the bill was against Evans and others, and Evans was neither a director nor shareholder, but was manager of the bank. The Vice-Chancellor said: "Whether he was a shareholder or not is immaterial, because a case of fraudulent misrepresentation is sufficiently stated against him, in respect of which he is liable, though he gained nothing by it."

But it is not necessary for us, here, to go thus far. Reed was a shareholder in the company, and it must be presumed he gained by the fraud and shared in the spoils. The court of equity will not attempt to make a contribution between the perpetrators of the tort, but, as they each shared in the proceeds, will hold each liable for all the consequences.

The judgment and decree of the circuit court is affirmed.

*Judgment affirmed.*