### ROBERTS v. HOLLIDAY.

1. In an action against an agent for fraudulent representations as to the location of real estate sold by him to plaintiff, after a disaffirmance of the contract, the measure of damages is the actual loss sustained, and and not the difference between the actual value of the property conveyed and the price.

2. A purchaser of real estate is entitled to rely on the representations of an agent, for the sale thereof, as to its location, and is not bound by the doctrine of "*caveat emptor*" to make further inquiries as to its boundaries. HANEY, J., dissenting.

(Opinion filed April 5, 1898.)

Appeal from circuit court, Brookings county.

Damages for deceit. Plaintiff had judgment and defendant appeals. Affirmed.

The facts are stated in the opinion.

*John C. Jenkins* and *Jenkins & Farrell*, for appellant.

*E. H. Canfield* and *Cheever & Hall*, for respondent.

FULLER, J. This action, sounding in tort, and based upon a $700 claim for damages, occasioned, it is alleged, by false, fraudulent, and deceitful representations of the defendant, by

which plaintiff was induced to enter into a contract for the purchase of real property, was tried to a jury, resulting in a verdict and judgment for $200 in favor of plaintiff, from which, and an order overruling a motion for a new trial, the defendant appeals.

It is conceded that, pursuant to the contract, and in full consideration of $2,400 for the land, respondent gave appellant, as the agent of the owner, Mina C. Warren, $100 in cash, five head of horses, valued at $600, and assumed the payment of two mortgages aggregating $1,000, and further obligated himself to pay her $700, evidenced by two equal installment notes, and that thereafter, by a mutual arrangement, respondent, by quit-claim deed, transferred the land back to Mina C. Warren, who delivered up said notes for cancellation, but no part of the money paid to appellant, nor the horses delivered to him, were ever returned. In support of the contention that the evidence is insufficient to make out a case against appellant, his counsel maintain that, "as plaintiff has failed to establish or prove the difference between the value of the farm actually received and the value of the farm he would have received had the boundaries been as represented, he has failed to show actual damage, and the verdict cannot be sustained." The evidence shows, and no claim is made to the contrary, that the land described in the contract of purchase is not nearly so valuable as the tract respondent actually thought he was buying, and, having rescinded the contract, on that account he could, upon proof of injury sustained to that extent by reason of the deceit complained of, rightfully recover in this action, in the way of damages, the value of all that appellant, as the agent of the grantor, has received and retained as part consideration for the property. Campbell v. Hillman, 61 Am. Dec. 195; Bartholomew v. Bentley, 15 Ohio 660; Kroeger v. Pitcairn, 101 Pa. St. 311; Hedden v. Griffen, 136 Mass. 229. That one who perpetrates a fraud acted throughout in the capacity of agent is no defense to an action against him to recover compen-

satory damages occasioned thereby. Reed v. Peterson, 91 Ill. 288. As the difference between the purchase price and the actual value of the property, though doubtless a material element, is not, under the circumstances of this case, the true measure of damages, proof of the loss, if any was occasioned by the false and fraudulent representations of appellant, is all that is essential to a recovery. Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39; Reynolds v. Franklin, 44 Minn. 30, 46 N. W. 139. It appears from the evidence that respondent, a resident of Minnesota, came to this state with a view to buying a farm, and on the 15th day of March, 1893, called at the office of appellant, in the city of Brookings, where a conversation was had between the parties to this suit, concerning which respondent testified in part as follows: "He (appellant) then told me that he had a piece of land to sell that would just strike me, and I told him, if it was nice level land, that that was the kind I wanted. He said it was all nice, level land, with the exception of probably eight or ten acres on the east side, which was a little bit rolling. He said the land was near Bruce, and belonged to a Miss Warren. That was my first visit to Brookings county, and I had never been in the vicinity of Bruce." Concerning further negotiations occurring on the following day, when the parties drove out to see the land, the witness said: "We first came to the land just west of the railroad track on the south side, then drove in a little northeasterly course up between the house and barn, and started up on the hill to the east, when something was said that, if the land went up there, we need go no further; that I would not have it under any consideration. Mr. Holliday rose up in the buggy, and looked back and forth a few minutes, then turned around, and drove in a northwesterly course along the foot of the hills to a ridge like and furrow mark. When we got down there, Mr. Holliday rose up in his buggy, looked back and forth, and says: 'That is the east line,' and he says, 'It runs to the fence; that fence you see over there.' He said he was never

on the land but once before.   *   *   *   Mr. Holliday wanted to know whether we wanted to go to the west line.   I said, 'If that fence is the west line it wasn't necessary to drive over there,' because we could look all over the whole quarter. 'Well,' he says, 'if you don't care to drive over there, we will drive on north a ways.'   This was the first time I ever saw this land, and I did not see it again until we reached Brookings. *   *   *   The fence to the west was a wire fence, and extended north and south.   When I learned where the ture west line was, in the fall of 1893, this fence was still there, and I should judge, about 60 rods west of the line.   The land between the railroad track and this fence is level, bottom land, and there was a narrow strip of level land on the east side of the railroad track.   The hills are real rough, steep and almost impassable.   The rocks are real thick, some as big as your fist and some as large as a table, or larger.   Mr. Holliday said the fence was the west line, and I believed what he said was true. He did not show me the southwest nor the northwest corner of the land, nor did he state anything about it other than I have already stated.   After we got back to town, I fold the defendant I would have to study over the matter.   If I took a notion to take the land, I would let him know.   The next morning I returned home.   Afterward I sent the defendant a telegram. He came to Luverne.   I executed the contract, and he put it on file.   *   *   *   The next day, his brother, Irving Holliday, came to my place, and I paid him $100.   The day following I took the horses to Luverne, and put them in the Union livery feed barn, where Irving Holliday had directed me to leave them.   I have never had the money or the horses in my possession since.   One day in the summer of 1893 I saw the defendant in this city, where I told him the land was not as he represented it, and that I was going to get the money and the horses back.   He made the remark that the man that was with him when I was up at Bruce was a lawyer, and that he had talked with him about the matter, and he said there was a

chance for me to get it back and a chance for me to lose, and he advised me not to go into it. He said he would not deny to me but what he got the horses and fifty dollars in money for his commission." Respondent, continuing, stated, among other things, that of the 147 acres in the farm but 72 acres can be broken, and, after the proper foundation had been sufficiently laid, he was rightly allowed to testify, over the objection of opposing counsel, that the horses delivered to appellant were at the time worth $120 apiece. Although the evidence is in some particulars conflicting, the testimony of the witness as to the representations made by appellant was fully corroborated, and the jury was justified in concluding that, with a knowledge of their falsity, appellant intentionally made representations concerning the location of the land, relying upon which respondent was induced to enter into the contract, by reason of which he was substantially, injured; and from the facts and circumstances in evidence, all of which were correctly submitted to the jury, we are convinced that the verdict of $200 in favor of respondent ought not to be disturbed.

As the tendency of modern authority is to encroach upon the old doctrine of *caveat emptor,* and place reasonable responsibility upon the seller, there is no merit in the contention that respondent was in duty bound to make further inquiry and investigation as to the boundaries of the land, and, having failed to do so, he cannot recover, though deceived and injured by appellant. Bank v. Taylor, 5 S. D. 99, 58 N. W. 297. The same proposition was urged in the case of Kirkland v. Lott, 3 Ill. 13, and the court say: "If the plaintiffs had made no representations as to the location of the lots, the defendant would reasonably have sought, and might have obtained, correct information from some other source; and it is not for the plaintiffs to say that it was his folly not to have done so, when their representations were the cause of his omission. Credulity on his part is no excuse for fraud on theirs." Respondent had the right to confidently rely upon every material representation

made by appellant. Warder, Bushnell & Glessner Co. v. Whitish, 77 Wis. 430, 46 N. W. 540; Carmichael v. Vandebur, 50 Iowa 651; Bristol v. Braidwood, 28 Mich. 191; Graham v. Thompson, 55 Ark. 299, 18 S. W. 58; Fargo Gas & Coke Co. v. Fargo Gas & Electric Co., (N. D.) 59 N. W. 1066. Every assignment of error argued by counsel for appellant has received merited attention. Finding no reversible error, the judgment appealed from is affirmed.

HANEY, J. dissenting.